IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2019

**STATE OF TENNESSEE v. JOSHUA DEREK TWEEDY**

**Appeal from the Circuit Court for Madison County**
**No. 00284844    Roy B. Morgan, Jr., Judge**

_____

**No. W2018-01202-CCA-R3-CD**

_____

The Defendant, Joshua Tweedy, was convicted by a Madison County Circuit Court jury of assault, a Class A misdemeanor, and possession of a firearm by a convicted violent felon, a Class B felony.  *See* T.C.A. §§ 39-13-101 (assault) (Supp. 2016) (subsequently amended), 39-17-1307(b)(1)(A) (Supp. 2017) (subsequently amended) (possession of a firearm by a convicted violent felon).  On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred in imposing an effective eighteen-year sentence.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant District Public Defender, for the Appellant, Joshua Tweedy.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jody Pickens, District Attorney General; Rolf Hazelhurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's offenses relate to an October 23, 2017 incident involving his then-girlfriend.  The couple lived together at the time of the incident, and the offenses occurred at their home.

At the trial, the victim testified that, at the time of the incident, she and the Defendant had been in an on-and-off relationship for about fifteen years.  She said that on

the evening of October 23, 2017, she and the Defendant were at home drinking after work. She said that while she was talking by telephone to her sister, the Defendant falsely accused the victim of taking some of his prescription narcotic medication. The victim said that she told her sister what was happening, that the Defendant snatched the phone from her hand, that he "jerked" her to the floor, and that he kicked her head, back, and arm while he wore steel-toed boots. The victim said that, as the Defendant kicked her head, he stated he "ought to kill" her with his boots. The victim said the Defendant held a gun in his hand the entire time they argued. The victim said she was afraid. The victim said that she escaped and ran to a neighbor's house and that the neighbor called the police. Photographs of her injuries were received as an exhibit. The victim identified her injuries as a large bruise and a mark on her arm, several "bruises and stuff" on her back, and unspecified injuries to her forehead.

The victim testified that the Defendant bought the gun about one month earlier from "Mr. Vincent." She identified a photograph of a gun and identified the gun as the one the Defendant had on the night of the incident. The exhibit depicted a black handgun with a brown handle. The victim acknowledged that she had testified at the preliminary hearing that she had not seen a gun on the night of the incident but stated that she had been having memory problems, which she attributed to dizzy spells that occurred after the Defendant kicked her head. She agreed that she had said at the preliminary hearing that she did not have memory problems.

The victim testified that "a lot of" police officers responded and that the police tried for about two hours to get the Defendant to come outside. She said she saw blue lights and spotlights. She said the police used a loud speaker to tell the Defendant to come outside. She said, however, that the Defendant did not come outside and that she eventually granted permission for the police to go inside the home.

The victim denied that she assaulted the Defendant on the date of the incident. She said she did not recall stating at the preliminary hearing that she had not been on the phone before the Defendant assaulted her. She said she had not made any statements to the Defendant's mother or sister about wanting to retrieve a gun from the Defendant's sister's house. She denied that she and the Defendant had gone to the Defendant's sister's house and that she had assaulted the Defendant at his sister's house earlier on the evening of the incident. She denied that she had made any statements about finding the gun or selling it to David Armour. She denied communicating with Mr. Armour about the gun. She agreed that she had stayed outside her home once she went outside and denied going back inside before the police arrived. The victim agreed that she told the police where she had seen the Defendant hide the gun. She stated that, although the Defendant had the gun in his hand while she was inside the home, she knew where he kept it. She acknowledged that she had spoken with the prosecutor since the preliminary

hearing and that they had discussed her statements to the police on the night of the incident and her preliminary hearing testimony.

When shown a gun, the victim testified that it was the Defendant's and stated he kept it under the mattress in their bedroom. She described their bedroom as the "back bedroom."

Madison County Sheriff's Deputy Shawn Hamilton testified that he responded to a domestic disturbance call on the evening of October 23, 2017. He said the caller had stated that she and her boyfriend "got into it," that she went outside and called for help, and that the boyfriend walked around outside with a gun.

Deputy Hamilton testified that when he arrived at the scene, the victim stated that she last saw the Defendant going inside their home and that the Defendant had a gun. Deputy Hamilton said he called for additional officers because a gun was involved. He said that he could smell alcohol on the victim's breath and that both the victim and the Defendant had been drinking.

Deputy Hamilton testified that the officers "lit the whole place up like it was Christmas with our patrol cars, with the spotlights" and asked the Defendant over a public address system to come outside. Deputy Hamilton said the officers tried to get the Defendant to come outside for at least two hours but that the Defendant never complied.

Deputy Hamilton testified that the victim wanted to go inside to sleep and that she gave the police permission to enter the home. He said that the police entered the home and that the Defendant came out of a back bedroom. Deputy Hamilton said that the Defendant was taken into custody and that the Defendant cooperated with the officers. Deputy Hamilton said the police found a gun under a mattress in the bedroom from which the Defendant had emerged. He identified the gun depicted in a previously received photograph exhibit as the gun that had been under the mattress. He identified .38-caliber ammunition that was found next to the gun.

Deputy Hamilton identified a judgment reflecting the Defendant's previous conviction for felony attempted aggravated kidnapping.

Madison County Sheriff's Deputy Rick Brooks testified that he was the second or third officer to respond to the scene. He said that at least eight deputies and two supervisors responded. He said that the officers were at the scene for one and one-half to two hours. He said they knocked on every window, door, and wall of the mobile home. He said that, eventually, the victim stated that she had been staying at the home, that she had nowhere else to go for the night, and that she consented for an officer to enter the

home to determine whether she could reenter safely. He said the officers did not know whether the Defendant was inside or had walked away from the home.

Deputy Brooks testified that the officers forced open the front door, announced their presence, and asked the Defendant to come outside. Deputy Brooks said the Defendant emerged from a bedroom and walked toward the front door. Deputy Brooks said the officers detained the Defendant and asked why he did not respond to their knocks and announcements. Deputy Brooks said the Defendant stated he had been asleep and had not heard them. Deputy Brooks said that, because the victim had stated a gun had been involved in the incident, the officers asked the victim where a gun might be found. He said the victim stated a gun would most likely be found in the bedroom from which the Defendant had emerged. Deputy Brooks said he found a .38-caliber revolver and several rounds of ammunition under a mattress in the bedroom. He identified the gun and ammunition he found.

Keesha Shults, the Defendant's half-sister, testified for the defense that she had been grilling outside her house around 7:00 p.m. on October 23, 2017, when the Defendant and the victim came to her house in the same car. She said that the Defendant and the victim argued. Ms. Shults said that the Defendant asked the victim to leave, that the victim did not leave, that the victim hit the Defendant in the stomach and face, and that the victim pushed the Defendant's face into the car seat. Ms. Shults said the assault alarmed her eight-year-old child. She said the Defendant asked her to "take [the victim] somewhere." Ms. Shults said the victim refused to leave, stated, "That's my house," and insisted that if someone left, it should be the Defendant.

Ms. Shults testified that she eventually persuaded the victim to get out of the car, that she offered to take the victim to the victim's sister's house, and that the victim continued to state that the victim was not leaving the victim's house. Ms. Shults stated that the victim got into the car in which the victim had arrived, that the Defendant and the victim resumed their argument, and that the victim resumed smashing the Defendant's face into the car seat. Ms. Shults said that she told the Defendant and the victim to leave and that they left.

Ms. Shults testified that she did not see the Defendant assault the victim while they were at her house on October 23, 2017. Ms. Shults did not know why the victim would deny having been at Ms. Shults's house that night.

Ms. Shults testified that approximately one day before October 23, 2017, she had gone to the Defendant and the victim's home to talk to the Defendant, but he had not been home. Instead, Ms. Shults encountered the victim, who said the victim needed to get her gun from Ms. Shults's house. Ms. Shults said she had been unaware that a gun was at her house. Ms. Shults said the victim stated, "[Y]ou know how your brother is, he

don't want to be around no gun [sic]." Ms. Shults said that she never saw the gun but that her mother returned it to the victim.

When shown photographs of the victim's injuries, Ms. Shults could not recall whether the victim had the injuries when the victim and the Defendant were at Ms. Shults's house on October 23, 2017. Ms. Shults said, though, that she did not recall the victim's having a red mark on her forehead.

Laureen Shults, the Defendant's mother, testified that she went to a hospital with the Defendant a couple of days before October 23, 2017. She said the Defendant was diagnosed with bronchitis and a muscular injury and received pain medication.

Ms. Shults testified that at an unspecified time before October 23, 2017, she took a gun from Keesha Shults's house to the Defendant and the victim's home. She said that no one had been home, that she put the gun on a shelf in a room in which she stored items, and that she did not tell anyone she put the gun there. She said she stored personal belongings and sometimes stayed at the Defendant and the victim's home because her home had burned. She acknowledged the Defendant's prior attempted aggravated kidnapping conviction, but when she was asked whether she knew it was illegal for him to possess a gun, she said she did not know much about the law.

David Armour testified that the victim and the Defendant had worked for him and that the victim and the Defendant lived together near his business. Mr. Armour said the victim and the Defendant did not work on October 23, 2017, because it had rained and Mr. Armour had been out of town.

When shown a photograph exhibit which depicted a gun, Mr. Armour testified that he had seen the gun previously when the victim sent a photograph of it to him in a text message. Mr. Armour said the victim stated "they" found the gun. He said the victim "wanted to know what I thought about it." He did not know why the victim would say she never communicated with him about the gun. He said he never communicated with the Defendant about the gun. Mr. Armour clarified that the Defendant and the victim found the gun.

Keesha Shults was recalled and testified that she had a conversation with the victim a day or two before October 23, 2017, and the victim told her that the victim wanted to get the victim's gun from Ms. Shults's house. Keesha Shults said that she asked the victim, "[W]hat gun?" and that the victim stated the victim had taken her gun to Keesha Shults's house and put it in a closet because the Defendant did not want to be around guns. Keesha Shults said that on the morning after this conversation, she told Laureen Shults about the gun in the closet. Keesha Shults said that without her knowledge, Laureen Shults took the gun to the Defendant and the victim's home due to

-5-

the children in Keesha Shults's home. Keesha Shults said that when she spoke to police after the October 23, 2017 incident between the victim and the Defendant, she thought the gun was still at her house.

The Defendant testified that he and the victim lived together and were romantically involved on October 23, 2017. He said that on the morning of October 23, he and the victim awoke and got ready for work but learned that their boss was out of town. He said the victim began drinking beer and he began cleaning their home. He said that later that day, they went to a store and to his sister's house. He said that they arrived at his sister's house around 7:30 p.m. and that he went there because the victim "started getting all crazy and stuff" because she had been trying to get him to give her some of his prescription pain medication. He said he had refused and that they had been arguing. He said the victim repeatedly hit him and demanded his medication. He said that he asked his sister to take the victim somewhere away from him, that his sister talked to the victim and got her out of the car, and that the victim stated she was not leaving. He said his sister eventually asked both him and the victim to leave. He said he and the victim went home.

The Defendant testified that after they returned home, the victim wanted to go to buy beer and "kept asking for a pill or something." He said she was upset because he would not go to the store or give her a pill. He said that he was ready to go to bed and that the victim "was stumbling around." He said she took out a knife and approached him. He stated that she was seated and threatened to stab him and that she said she hated him. He said that she swung the knife at him, that he could not escape because she was between him and the door, and that he picked up a coat and hit her arm, startling her. He said that he grabbed her arm and that they wrestled. He acknowledged that they wrestled on the floor. He said he tried to get the victim to drop the knife. He said he had tried to hold her down at one point when he was trying to get her to release the knife. He said that eventually, he was able to get her to release the knife and that he "let her up." He said that the victim went outside and that he locked the door.

When shown photograph exhibits depicting the victim's injuries, the Defendant testified that the injuries could have occurred when he tried to get the knife from the victim. When asked if the victim sustained any injuries before the altercation, the Defendant said she had complained of back pain. He said the victim's forehead and arm injuries might have happened when he and victim "got into it." The Defendant stated that the victim had not been on the telephone during the incident. He denied waving a gun during the incident.

The Defendant testified that he had gone to Memphis with his boss a couple of weeks before October 23, 2017. The Defendant said that while he was in Memphis, the victim found a gun while she cleaned storage containers that their boss planned to sell.

The Defendant said that when she told him about the gun, he said, "[Y]ou need to get that gun away from me [be]cause I'm not even supposed to be around that gun, so . . . do whatever you want with it, . . . give it away, carry it . . . somewhere, but get it out of the house." He said the victim left for about two hours and stated when she returned that she got rid of the gun. He said he told her not to tell him where she put it. He said he did not know anything about the gun until the police asked him about it after the incident. He said that when the police asked where the gun was, he said, "I don't know what gun you're talking about. I don't have a gun." He acknowledged that a gun was found in the house but said he had been unaware of its presence. He said that if someone had hidden the gun under the mattress, it would have been the victim, whom he said washed the linens and made the bed.

The Defendant testified that he had been asleep when the police had been outside his home on the night of October 23, 2017. He said he slept through all of their efforts. He agreed that he lived in a single-wide house trailer. He said he had been on medication that made him drowsy and noted the absence of windows in the room in which he had been. He said that once the police entered the home, he heard them and went to see what was happening. He said he complied with the officers' instructions once he was aware of their presence.

The Defendant testified that he did not possess a gun and was unaware a gun was present on October 23, 2017. He acknowledged a 2005 conviction of attempted aggravated kidnapping and a ten-year sentence. When asked if he reported to anyone that the victim's injuries might have happened when they wrestled over the knife, the Defendant said, "Nobody ever asked me." He said the officers' only concern was the gun. When asked if he was not concerned about the knife, he responded, "I had the right to remain silent." He acknowledged that he had not called the police when the victim displayed the knife and that his response to being attacked with a knife had been to go to bed.

On rebuttal, Deputy Brooks testified that to his knowledge, a knife was not mentioned when the police were at the Defendant and the victim's home on October 23, 2017. He said that when he encountered the Defendant after the police entered the home, the Defendant did not say the victim had attacked him with a knife.

After receiving the proof, the jury acquitted the Defendant of aggravated assault and found him guilty of the lesser-included offense of misdemeanor assault. The jury also found the Defendant guilty of being a convicted violent felon in possession of a firearm. At a sentencing hearing, the trial court imposed a sentence for assault of eleven months and twenty-nine days to be served in jail, with 75% release eligibility. For the firearm offense, the court found that the Defendant was a Range II, multiple offender and

imposed an eighteen-year sentence to be served in the Department of Correction. The court ordered concurrent service of the sentences. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.    Assault

As relevant to the Defendant's assault conviction, "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" *See* T.C.A. §§ 39-13-101(a)(2) (Supp. 2016) (subsequently amended). Although the Defendant alleges in his statement of the issue that the evidence was insufficient to support his convictions, his only argument pertains to the firearm offense. With regard to the sufficiency of the evidence to support the assault conviction, issues which are unsupported by argument, references to the record, and citations to authority are waived. *See* Tenn. Ct. Crim. App. R. 10(b). In any event, we have reviewed the record and conclude that the evidence, viewed in the light most favorable to the State, supports the assault conviction.

**B.      Possession of a Firearm by a Convicted Violent Felon**

As relevant to the Defendant's conviction of being a violent felon in possession of a firearm, "A person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon[.]"   T.C.A.  §  39-17-1307(b)(1)(A)  (Supp.  2017)  (subsequently amended).  "'Crime of violence' includes . . . aggravated kidnapping[.]"  *Id.* § 39-17-1301(3) (Supp. 2017) (subsequently amended).

The Defendant contends that the evidence is insufficient because the State failed to prove (1) that he possessed the gun and (2) that the facts of his previous attempted aggravated kidnapping conviction involved "the use or attempted use of force, violence, or a deadly weapon."

The victim testified that the Defendant bought a gun about one month before the offenses and that the Defendant possessed the gun during the incident which formed the basis of the convictions.  The evidence showed that the victim was asked where the gun might be, that she identified the location where she claimed the Defendant stored the gun, and that the officers found a gun and ammunition in this location.  The Defendant claimed that the gun which was found under the mattress was there without his knowledge and must have been placed there by the victim.  He denied that he had possessed a gun during his altercation with the victim on October 23, 2017, but the jury rejected this evidence and credited proof to the contrary, as was the jury's province as the trier of fact.  The Defendant argues on appeal that the State failed to offer forensic proof linking him to the gun that was found under the mattress, but this argument overlooks the victim's testimony, credited by the jury, that he possessed the gun during the altercation in which she was injured.  Viewed in the light most favorable to the State, the evidence shows that the Defendant unlawfully possessed a firearm during the incident which formed the basis for the convictions.

With regard to the State's proof regarding the nature of the predicate conviction which formed the basis for the present firearm conviction, the Defendant acknowledged his prior attempted aggravated kidnapping conviction, and a copy of the judgment was received as an exhibit. Aggravated kidnapping is classified by Code section 39-17-1301(3) as a violent offense.  Thus, any inquiry into the underlying facts of the prior offense is not relevant.  The evidence is sufficient to support the firearm conviction.

The Defendant is not entitled to relief on this basis.

## II

## Sentencing

The Defendant contends that the trial court erred in determining the length of the sentence for the firearm offense and in imposing incarceration, rather than an alternative sentence. The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentencing range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

No testimony was offered at the sentencing hearing, but the presentence report was received as an exhibit. The report reflects that the then-thirty-nine-year-old Defendant received a high school special education certificate of completion, completed a trade school building maintenance program, and received multiple vocational education certificates during prior incarceration. He had completed anger management and substance abuse programs. He reported that he had issues with alcohol use and had participated in multiple treatment programs. He had done construction and contracting work. He had a lengthy history of criminal convictions and prior periods of incarceration spanning his adult life.

The trial court found that enhancement factor (1) applied based on the Defendant's prior history of criminal convictions. *See* T.C.A. § 40-35-114(1) (Supp. 2017) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). The court found that no mitigating factors applied. *See id.* § 40-35-113 (2014). The defense did not dispute that the Defendant was a Range II offender. The Defendant faced a sentence of twelve to twenty years for the Class B felony, and the court was heavily influenced by the Defendant's prior criminal history and the facts of the present offense in imposing the eighteen-year sentence. With regard to the manner of service of the sentence, the court found that the Defendant's successful rehabilitation was not a "realistic probability." The court again noted the Defendant's criminal history and stated that incarceration was necessary to protect the public, to avoid depreciating the seriousness of the offense, and to serve as an effective deterrent to others who might commit similar crimes. Thus, the court ordered incarceration.

On appeal, the Defendant argues that the court erred in imposing a "harsh, lengthy sentence" and that he should have received a "suspended sentence." He has not, however, provided any argument to support a conclusion that the trial court erred in applying enhancement factor (1). Likewise, he has not identified any mitigating factors for which evidence existed but which the trial court failed to apply. Similarly, he has not provided any further argument or citation to authority to support a conclusion that the trial court erred in imposing incarceration.

As we have stated, the record reflects that the Defendant has a long history of criminal convictions and prior incarceration. The trial court imposed a within-range sentence, and we conclude that the court did not abuse its discretion in sentencing the Defendant to eighteen years for the firearm offense.

With regard to the Defendant's argument that he should have received an alternative sentence, we note that the Defendant was neither presumed a favorable candidate for an alternative sentence nor was he eligible for probation. *See id.* §§ 40-35-102(6)(A) (2014) (stating that especially mitigated or standard offenders convicted of Class C, D, or E felonies are presumed, in the absence of evidence to the contrary, to be considered a favorable candidate for an alternative sentence), 40-35-303(a) (Supp. 2017) (stating that a defendant is eligible for probation if his sentence is ten years or less).[1] The Defendant has not provided any argument and citation to the facts in the record which support a conclusion that the trial court erred in denying alternative sentencing, and no such arguments and factual bases are apparent. We conclude that the trial court did not abuse its discretion in ordering incarceration.

---

[1] As a Range II offender, the Defendant faced a potential sentence of twelve to twenty years. *See id.* § 40-35-112(b)(2) (2014).

-11-

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE